UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LYNN RABER**,                                     Case No. 4:12 CV 97

        Plaintiff,                          Magistrate Judge James R. Knepp II

   v.                                       MEMORANDUM OPINION AND
                                                     ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

### INTRODUCTION

Plaintiff Lynn Raber seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

On September 4, 2009, Plaintiff filed an application for DIB stating she was disabled due to degenerative arthritis in her knees, a herniated disc in her neck, bilateral carpal tunnel syndrome, and irritable bowel syndrome, and she alleged a disability onset date of May 10, 2007. (Tr. 33, 137, 164). Her claim was denied initially (Tr. 81) and on reconsideration (Tr. 92). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 98). Born September 3, 1956, Plaintiff was 54 years old when the hearing was held on August 23, 2011. (Tr. 23, 33, 137). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 16, 23–70).

<u>Vocational and Medical History</u>

Plaintiff graduated from high school in 1974 and earned a bachelor's degree in social work from Bowling Green State University in 1977. (Tr. 36). She also attended seminars and classes to obtain a certification for religious education work. (Tr. 36–37). Plaintiff has past work experience as a social worker. (Tr. 165). After her alleged onset date, she performed a number of part time positions that did not rise to the level of substantial gainful activity, including working as a substitute teacher, secretary, latchkey fill-in, and Director of Religious Education for a church. (Tr. 39–40, 173, 232).

On March 21, 2005, Dr. John E. Thompson diagnosed cervical disc disease and ordered x-rays. (Tr. 525). Tests on April 3, 2005 showed degenerative disc disease from C4 through C6, including spondylosis along the disc margins causing some distortion of the neural foramina bilaterally. (Tr. 265).

Tests on January 12, 2006 showed moderate degenerative arthritis in the L4-5 facet joints bilaterally, with L5 appearing completely sacralized. (Tr. 261). On April 4, 2006, Dr. Thompson diagnosed right leg radiculopathy. (Tr. 520). Plaintiff said she was feeling well overall. (Tr. 520). Examination of her back revealed no pinpoint tenderness and her leg strength was intact, but she had a positive straight leg raise test on the right. (Tr. 520). An MRI of Plaintiff's lumbar spine performed April 15, 2006 showed grade I anterolisthesis of L5 on S1 and spondylolisthesis causing mild bilateral neural foraminal stenosis at L5-S1 with no significant disc herniation. (Tr. 253). On August 16, 2006, Plaintiff saw Dr. Thompson and reported a lot of muscle aches and pains. (Tr. 518). A stress test performed in September 2006 was normal, showing good exercise tolerance. (Tr. 518, 255–56). On November 20, 2006, Plaintiff reported she was dropping things and Dr. Thompson

2

noted a neurologist found Plaintiff had carpal tunnel syndrome as well as severe radiculopathies. (Tr. 517). Physical examination revealed a steady gait, positive Tinel's sign on Plaintiff's right hand and paraspinal muscle tightness, but no pinpoint tenderness. (Tr. 517). On November 21, 2006, a whole-body bone scan showed findings that most likely represented degenerative changes in Plaintiff's lumbar spine and bilateral patella. (Tr. 252).

On March 5, 2007, Dr. Thompson indicated treatment had not improved Plaintiff's conditions much. (Tr. 515). He noted she had bilateral carpal tunnel syndrome and questionable cervical and lumbar radiculopathies supported by EMG and nerve conduction studies. (Tr. 515). Plaintiff complained of pain in her joints. (Tr. 515). Despite poor posture, Plaintiff ambulated "pretty steadily", had no joint effusions, and had a fair range of motion. (Tr. 515). Dr. Thompson noted Plaintiff could not take NSAIDs due to gastric dyspepsia and prescribed Darvocet. (Tr. 515). He also diagnosed polyneuropathies from disc disease. (Tr. 515). On April 16, 2007, Plaintiff told Dr. Thompson she planned to have surgery on her left knee in May. (Tr. 514). She had crepitation of her knees bilaterally and Dr. Thompson diagnosed osteoarthritis. (Tr. 514). Dr. Thompson also reported Plaintiff had experienced some improvement after receiving epidurals for cervical radiculopathy. (Tr. 514).

On August 6, 2007, Plaintiff told Dr. Thompson she was recovering well after undergoing a carpal tunnel procedure on her right hand. (Tr. 513). On November 5, 2007, Plaintiff saw Dr. Thompson and complained of mild swelling in her legs. (Tr. 512). Plaintiff's neurological exam, motor function, reflexes, and sensation were intact at that time. (Tr. 512). Plaintiff next saw Dr. Thompson on April 14, 2008 and stated she was feeling well. (Tr. 510). Her motor function, reflexes, and sensation were still normal. (Tr. 510).

On July 14, 2008, Plaintiff went to orthopedic surgeon Dr. Alexander Michael and reported aching and swelling in her right knee, aggravated by sitting, standing, and walking. (Tr. 334). She also stated she felt instability while walking and indicated problems climbing stairs. (Tr. 334, 336). Plaintiff was in no acute distress but walked with an antalgic gait. (Tr. 334). She had some tenderness in her right knee but normal motor strength, intact sensation, and good right knee tone. (Tr. 334). Plaintiff's range of motion caused discomfort and McMurray's test was positive on her right knee. (Tr. 334). X-rays showed moderate arthritis of the medial aspect of Plaintiff's knee. (Tr. 334). An MRI showed results likely indicating a degenerative meniscal tear, intermediate to high-grade patellofemoral chondromalacia with mild medial capsulosynovitis, and a small, slit-like Baker cyst. (Tr. 345). On July 18, 2008, Plaintiff told Dr. Michael her condition had not changed. (Tr. 332). She was in no acute distress and walked with a normal gait. (Tr. 332). She had some right knee tenderness but no instability or strength issues and a full range of motion. (Tr. 332). Her McMurray's test was positive medially in the right knee, and her sensation was intact. (Tr. 332–33). Plaintiff decided to proceed with surgical arthroscopy of her right knee and underwent the procedure on August 18, 2008. (Tr. 333, 346).

On August 19, 2008, Plaintiff saw Dr. Michael for post-operative treatment and reported significant pain. (Tr. 331). Plaintiff had mild swelling and tenderness in her right knee and her right knee strength was diminished post-operatively. (Tr. 331). Her range of motion was diminished and caused mild discomfort, and her sensation was intact. (Tr. 331). Tests on August 26, 2008 showed no evidence of deep or superficial vein thrombosis in either of Plaintiff's legs. (Tr. 342).

When Plaintiff followed up with Dr. Michael on September 2, 2008, her pain was not significant. (Tr. 329). At that time, Plaintiff stated she had started experiencing cramping and pain

in her left knee. (Tr. 329). Plaintiff was in no acute distress, walked with a normal gait, and had no swelling in her right knee. (Tr. 329). Her left knee showed no instability, effusion, or atrophy of the vastus medialis, but tenderness of the left anserine bursa. (Tr. 329). Her motor strength and sensation were intact and she had a full left knee range of motion but diminished right knee range of motion. (Tr. 329). A number of left knee tests were negative, and Dr. Michael ordered physical therapy. (Tr. 329).

On October 14, 2008, Plaintiff told Dr. Michael her condition was improving and she was attending physical therapy as ordered. (Tr. 327). Plaintiff was in no acute distress but walked with an antalgic gait. (Tr. 327). She had tenderness at the left paravertebral area, left sciatic notch, and left SI joint, along with decreased lordosis and decreased pelvic tilt. (Tr. 327). Additionally, Plaintiff had some muscle tenderness over her left hip. (Tr. 327). Plaintiff's spine range of motion was limited and she had a positive left straight leg raise test with radicular pain, but full strength in her lower extremities. (Tr. 327). Her lower extremity sensation was also intact and her knee exam was mostly normal. (Tr. 327). Dr. Michael noted Plaintiff's knee was doing well. (Tr. 327).

On October 21, 2008, an MRI of Plaintiff's lumbar spine showed degenerative disc disease and spondylosis involving her lumbar. (Tr. 341). The MRI also showed facet arthropathy involving her lower lumbar spine and grade I anterior spondylolisthesis of L5 on S1. (Tr. 341). Plaintiff told Dr. Michael her condition had not significantly changed on October 29, 2008, and Dr. Michael ordered additional physical therapy. (Tr. 325–26).

Between November 18, 2008 and December 16, 2008, Plaintiff received three lumbar epidural steroid injections to treat her persistent lower back pain and bilateral radicular symptoms.

(Tr. 308, 310–11). At her final appointment, treatment notes indicated the steroid injections had provided her a benefit of approximately 40 percent. (Tr. 308).

Plaintiff saw Dr. Vincent Wake on November 25, 2008 regarding her lower back pain and left leg pain. (Tr. 323). Plaintiff reported receiving epidural steroid injections and said she was in physical therapy. (Tr. 323). She also stated she felt about 50 percent improvement following her first epidural injection and reported she was happy with her treatment. (Tr. 323). Dr. Wake's notes indicated Plaintiff worked as a substitute teacher. (Tr. 324). Physical examination showed Plaintiff had a mildly antalgic gait favoring her right side, but intact sensation, normal reflexes, and full motor strength. (Tr. 324). Left knee extension caused pain and she had mild buttock pain with left external rotation of her leg. (Tr. 324). Dr. Wake diagnosed degenerative disc disease and left leg symptoms, stating Plaintiff should continue physical therapy and epidural injections. (Tr. 324).

On December 23, 2008, Plaintiff told Dr. Wake the epidural injections helped her leg and lower back pain but said she had foot and neck pain. (Tr. 321). Plaintiff was "full weightbearing" and reported she was about 60 percent better than before physical therapy and the epidural steroid injections. (Tr. 321). She stated her left knee pain had essentially resolved and her back pain was significantly better. (Tr. 321). Physical examination showed Plaintiff was neurologically intact in both lower extremities, without deficit. (Tr. 321). She was still a little weak "in her right knee where she had her most recent arthroscopy, but really [wa]s doing fairly well." (Tr. 321). Plaintiff was also neurologically intact in her upper extremities, with no evidence of hyperreflexia. (Tr. 321). Notes suggested adding a neck program to Plaintiff's physical therapy to improve her symptoms. (Tr. 321).

Plaintiff returned to Dr. Wake on February 3, 2009 to follow up on her neck pain, stating she felt worse since her last visit. (Tr. 320). Plaintiff told Dr. Wake she was a substitute teacher and

worked occasionally. (Tr. 320). She complained of aching pain, burning, and soreness, with pain radiating to her shoulders. (Tr. 320). Plaintiff also reported numbness and tingling in her hands and fingers, and pain and cramping in her right calf. (Tr. 320). Plaintiff noted her left leg radicular symptoms had improved, but she still complained of bilateral knee pain. (Tr. 320). She was more concerned, however, with her radiating neck pain. (Tr. 320). Physical examination showed Plaintiff was neurologically intact in her upper and lower extremities and Dr. Wake did not identify any gross neurologic deficit. (Tr. 320). Dr. Wake diagnosed degenerative disc disease of the cervical spine, axial neck pain, bilateral upper extremity radicular symptoms, left radicular symptoms in her lower extremity that were resolving, and grade I spondylolisthesis at L4-L5 and L5-S1. (Tr. 320). He ordered an MRI, which ultimately showed central C6-C7 disc herniation, broad central C5-C6 disc herniation and osteophytes effacing the anterior subarachnoid space, broad left-sided C4-C5 disc herniation and osteophytes effacing the anterior subarachnoid space, and uncovertebral osteophytes producing moderate bilateral C4-C5 and moderate bilateral C5-C6 foraminal stenosis. (Tr. 320, 340).

When Plaintiff returned to Dr. Wake on February 12, 2009, she stated she felt worse and had difficulty with her neck range of motion. (Tr. 319). Dr. Wake diagnosed degenerative disc disease of her cervical spine, multilevel disc bulging, and bilateral upper extremity radicular symptoms. (Tr. 319).

On February 24, 2009, Plaintiff saw Dr. Thompson, complaining of dizziness. (Tr. 509). She described intensely painful radiating pain shooting down from her neck into her shoulders, along with numbness and tingling. (Tr. 509). Plaintiff also reported this made it difficult for her to use her arms and described episodes of losing her balance. (Tr. 509). Dr. Thompson diagnosed vertigo and

7

cervical radiculopathies. (Tr. 509).

On March 17, 2009, Plaintiff saw Dr. Dorfman to follow up regarding bilateral upper extremity paresthesias. (Tr. 337). Tests showed bilateral median sensorimotor neuropathy across her wrist and findings consistent with moderate bilateral carpal tunnel syndrome. (Tr. 339). There was no electrodiagnostic evidence of an acute or chronic cervical radiculopathy. (Tr. 339).

On April 7, 2009, Plaintiff went to Orthopaedic Multispecialty Network, Inc. and described her pain as constant aching, burning pain radiating to her elbows bilaterally, with numbness, tingling, and weakness in the affected areas. (Tr. 316–17). Plaintiff's elbows were normal to inspection and palpation and her right elbow had a full range of motion. (Tr. 317). Examination revealed no deformity, ecchymosis, edema, or erythema in her right wrist, and no tenderness in a number of areas. (Tr. 317–18). A number of right wrist tests were negative, and she had full flexion and extension of her right wrist and full range of motion in her right fingers. (Tr. 318). The doctor thought she had cervical radiculopathy at C5-6 despite her normal EMG, and Plaintiff wanted to try cervical epidural steroid injections. (Tr. 318).

On April 20, 2009, neurologist Dr. Tracy L. Neuendorf wrote to Plaintiff's other physicians after evaluating Plaintiff regarding her diagnoses of cervical radiculopathy, protruding disc with osteophyte at C5-6, bulging disc at C3-4, C4-5, and C6-7, degenerative osteoarthritis with facet hypertrophy and facet syndrome at C2-3, C3-4, C4-5, and C5-6, bilateral carpal tunnel syndrome status post surgical correction, and chronic pain. (Tr. 560). She noted doctors had told Plaintiff she was not a candidate for further carpal tunnel syndrome surgery or other surgeries. (Tr. 560). Plaintiff's physical examination showed she was in no acute distress, but in chronic pain. (Tr. 561). Her cervical spine examination showed significant muscle spasm, trigger point activities, and

8

decreased range of motion, along with positive Spurling's sign on the right. (Tr. 561). Her deep tendon reflexes were intact and bilaterally symmetrical, and she had negative bilateral knee examinations with the exception of some mild arthritis. (Tr. 562). Plaintiff's examination also showed a fine C5-6 sensory deficit in her right arm. (Tr. 562). Dr. Neuendorf recommended cervical spine epidurals, which Plaintiff received between May 4, 2009 and June 1, 2009. (Tr. 562, 566–68).

Plaintiff returned to the pain clinic on June 29, 2009 complaining of bilateral arm pain. (Tr. 559). Notes indicated Plaintiff had tried physical therapy and felt the cervical epidurals improved her condition 40 percent overall. (Tr. 559). Her primary complaint was pain and weakness down her left arms to the elbow, and she also complained of lower back pain with right lumbar radiculopathy. (Tr. 559). Plaintiff rated her pain as a six out of ten and indicated problems sleeping. (Tr. 625). Plaintiff's physical examination and diagnoses remained the same, and Dr. Neuendorf noted Plaintiff needed additional injections. (Tr. 559).

On July 14, 2009, Plaintiff saw Dr. Thompson complaining of knee pain and increased neck discomfort. (Tr. 508). She received epidural injections and Dr. Thompson diagnosed osteoarthritis of her knees, noting Plaintiff could not tolerate NSAIDs due to gastrointestinal problems. (Tr. 508). Dr. Thompson diagnosed cervical arthritis and prescribed Darvocet and a pain relief gel, noting Plaintiff could see orthopedics at her convenience. (Tr. 508).

Between August 3, 2009 and August 31, 2009, Plaintiff received three cervical epidural block injections from Dr. Neuendorf. (Tr. 563–65). She returned to the pain clinic on September 24, 2009 reporting she had about 40 to 50 percent relief for four to five days following the injections. (Tr. 558). Plaintiff was interested in moving forward with radiofrequency treatment. (Tr. 558). She reported her current pain was a six out of ten. (Tr. 558, 624). Plaintiff's physical examination

9

findings and diagnoses remained the same. (Tr. 558). She underwent therapeutic radiofrequency neurolysis to treat her cervical spine on October 26, 2009. (Tr. 631).

Plaintiff followed up with the pain clinic on November 19, 2009 and rated the pain in her shoulders, arms, hands, and knees as a seven out of ten. (Tr. 624). She was not sleeping well, had only experienced ten to fifteen percent pain relief from her cervical epidural, and used Ibuprofen to take the edge off her pain. (Tr. 624). Plaintiff stated her right knee hurt worse than her left knee and the doctor noted Hyalgan injections could help. (Tr. 629). Plaintiff stated she also wanted left cervical radiofrequency. (Tr. 629). She had pain in the cervical spine area along with severe compensatory spasm and swelling in the left cervical and thoracic areas. (Tr. 629). She also had pain with extension, and her bilateral knees showed severe degenerative joint disease. (Tr. 629). The doctor ordered left cervical radiofrequency and right knee Hyalgan injections. (Tr. 629).

On January 18, 2010, Plaintiff underwent therapeutic radiofrequency neurolysis. (Tr. 630). She went to the pain clinic on February 4, 2010 for a right knee injection and reported pain in her neck, shoulders, arms, knees, and left foot. (Tr. 623, 628). Plaintiff said she had experienced 75 percent pain relief after radiofrequency treatment. (Tr. 623, 628). Plaintiff also reported a bump on her left foot, accompanied by pain so severe she sometimes could not walk. (Tr. 628). Plaintiff's right knee had pain and crepitus upon extension. (Tr. 628). In addition to her previous diagnoses, Plaintiff was diagnosed with degenerative joint disease of the bilateral knees. (Tr. 628).

On February 18, 2010, Plaintiff reported pain in her neck, shoulders, and knees. (Tr. 623). She also reported trouble sleeping and heel spurs. (Tr. 623). Examination of Plaintiff's left knee showed pain in the medial collateral area, pain with crepitus, and some swelling. (Tr. 627).

On February 25, 2010, Plaintiff saw Dr. Wake to follow up on neck pain. (Tr. 636). She

reported some relief from radiofrequency treatments. (Tr. 636). Dr. Wake also noted Plaintiff was there to discuss disability paperwork, further noting he had not seen her for close to a year. (Tr. 636). Notes indicated Plaintiff was a substitute teacher. (Tr. 636). Dr. Wake reported Plaintiff continued to have neck pain and upper extremity symptoms despite receiving injections. (Tr. 636). Dr. Wake asked Plaintiff if her symptoms were bad enough to consider surgical intervention, and Plaintiff stated she was trying to avoid surgery. (Tr. 636). Plaintiff walked with a slow but steady gait and reported subjective dysesthesias in the C6 and C7 distribution. (Tr. 636). Plaintiff exhibited some generalized weakness on manual motor testing, but had no deficits Dr. Wake could appreciate. (Tr. 636). She also had no hyperreflexia and had a negative Hawkin's sign. (Tr. 636). He diagnosed cervical degenerative disc disease with spondylosis, cervical herniated disc, and upper extremity radiculitis bilaterally, right greater than left. (Tr. 637). Dr. Wake had a long discussion with Plaintiff regarding her disability request. (Tr. 637). Plaintiff told him she electively quit work in 2007 and had been unable to find part-time employment. (Tr. 637). Plaintiff also noted her medical ailments and told Dr. Wake it was difficult for her to work. (Tr. 637). Dr. Wake told her he had no problem ordering a functional capacity exam and would give his medical opinion regarding disability status from a spine standpoint. (Tr. 637).

On March 11, 2010, Plaintiff returned to the pain clinic for a second knee injection and reported her current pain level was a four out of ten. (Tr. 622). Plaintiff said she had pain in her neck, knees, and shoulders and had problems sleeping. (Tr. 622). She reported relief from the injections. (Tr. 644). Examination of Plaintiff's knee showed pain with crepitus and some swelling. (Tr. 644). She received additional knee injections on March 26, 2010 and April 2, 2010. (Tr. 639–40).

11

On April 12, 2010, Plaintiff went to the pain clinic complaining of neck, shoulder, and bilateral knee pain. (Tr. 681). She said she felt her cervical injections had helped "a lot" and was at the office for reevaluation of her knees. (Tr. 681). Plaintiff said she felt better after receiving knee injections. (Tr. 681). She still had a cystic-like mass on her left foot that was somewhat painful, along with pain in her right knee and crepitus on extension. (Tr. 681). Plaintiff received a fifth injection in each knee and Dr. Neuendorf recommended additional injections. (Tr. 681).

On June 30, 2010, Plaintiff saw Dr. Thompson for a follow-up appointment regarding arthritis in her left hip and back. (Tr. 668). He noted Plaintiff had a decreased range of motion in her lumbar spine and crepitation of the knees. (Tr. 668). Dr. Thompson started Plaintiff on medication for her osteoarthritis. (Tr. 668).

Plaintiff underwent a bone density test on November 10, 2010 which showed she was osteopenic, with a moderate fracture risk. (Tr. 676).

Over the years, Plaintiff also treated with a number of doctors for chronic allergies and sinus problems (Tr. 540, 548–57, 618–19), gastrointestinal issues (Tr. 263, 296–99, 521–23, 619, 668, 699), and hypertension (Tr. 508, 510, 512, 514–15, 519–21, 525, 528–29, 614, 668). She also saw a counselor for depression and anxiety. (Tr. 615–17, 654–60).

Physical Therapy

In addition to her doctor appointments, Plaintiff attended physical therapy multiple times per week between August 2008 and April 2009. (*See* Tr. 347–503). Overall, Plaintiff showed improvement. She frequently reported only mild or moderate discomfort (Tr. 397, 403, 406, 409, 412, 414, 432, 442, 446, 452, 454, 482–83, 488, 492, 497, 501) and was able to tolerate her exercises well or relieve her discomfort through exercises and traction (Tr. 357, 366, 373, 382, 385, 387, 403,

418, 446, 450, 471, 475, 487, 491). Plaintiff reported improvement throughout therapy and made progress toward her therapy goals. (*See, e.g.,* Tr. 348–49 356, 359, 368, 379, 385, 389–90, 397, 412–14, 420, 426, 428, 430, 432, 434–35, 457–58, 460, 462, 464, 470, 472, 474, 476, 478–79, 499). Also, several times when Plaintiff reported increases in pain, she felt this could have been due to other factors such as illness, slipping and falling on the ice, or bowling. (Tr. 394, 426, 428, 430). At Plaintiff's last physical therapy appointment, she reported 60 percent improvement since starting therapy, reported her pain ranged between a two and a seven, had almost entirely normal strength, and felt her symptoms were not as bad as usual, stating she felt "ok" overall. (Tr. 348–50). Despite this, when Plaintiff discharged herself from therapy, she said she felt she was getting only temporary relief from treatment. (Tr. 347).

Opinion Evidence

On December 12, 2009, state agency physician Dr. Michael Stock reviewed Plaintiff's medical record and assessed her physical residual functional capacity (RFC). (Tr. 606–13). He found she could lift ten pounds frequently and twenty pounds occasionally, could stand, walk, or sit for about six hours in an eight-hour workday, and was unlimited in pushing or pulling. (Tr. 607). Dr. Stock noted the medical evidence did not support the alleged severity of Plaintiff's conditions. (Tr. 608). He also noted Plaintiff's file contained no other statements of functional capacity. (Tr. 608). Dr. Stock opined Plaintiff could frequently balance, stoop, crouch, and crawl. (Tr. 608). He stated she could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and kneel. (Tr. 608). Dr. Stock stated Plaintiff was limited to occasional overhead lifting due to degenerative disc disease of her cervical spine. (Tr. 609). He found she had no visual or communicative limitations, but should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to chronic

13

rhinosinusitis. (Tr. 609–10).

On March 18, 2010, Dr. Wake wrote to Plaintiff's attorney stating Plaintiff had completed the form she gave Dr. Wake to fill out and he had not authorized anything reported on that form. (Tr. 632). Dr. Wake further indicated he had performed a functional capacity exam and would attach a copy of the objective examination. (Tr. 632). His treatment notes from that day stated Plaintiff had no new complaints, still had no desire to proceed with surgical intervention, and continued to complain of numbness and tingling in her hands and arms, and he noted cervical degenerative disc disease and bilateral upper extremity radiculitis. (Tr. 635).

Reports to the Agency

Plaintiff reported symptoms of pain in her neck and knees, fatigue, nausea, dizziness, numbness, tingling in her hands and arms, headaches, occasional chest pain and pressure, aching, sweating, and weakness. (Tr. 164, 210). She said she lacked the energy to complete basic tasks, could not stand for more than ten minutes due to knee pain, and could not complete basic cleaning duties. (Tr. 164). She also said pain prevented her from sleeping through the night, noting she woke up in pain with numbness in her hands and arms and frequently had to shift positions to remain comfortable while sleeping. (Tr. 164, 203). Plaintiff reported she always felt fatigued and took naps during the day. (Tr. 191). She explained her symptoms were brought on or worsened by exertion, climbing stairs, being on her feet, constant movement, or remaining in one position for too long. (Tr. 210). She also reported she could not take narcotic pain medication or muscle relaxants due to stomach problems. (Tr. 213).

Plaintiff said she quit her most recent job on May 1, 2007, for reasons unrelated to her condition, explaining she moved about an hour away from her job and could not drive to work from

14

her new home. (Tr. 164). She reported she lived in a house with her husband and said a typical day consisted of getting up, making coffee, and sometimes making breakfast before taking a shower, resting, watching television, and driving to church or doctor appointments. (Tr. 202–03). Plaintiff also stated she took care of two dogs. (Tr. 203). Before her conditions, Plaintiff said she had participated in sports and bowling leagues and worked a full time job. (Tr. 203).

Plaintiff reported she could prepare simple meals several times a week but had to sit down to take breaks. (Tr. 204). She said she could do light housekeeping and laundry but no outdoor chores, explaining she did not do yard work because she could not bend, kneel, push a lawnmower, or shift gears on a riding lawnmower. (Tr. 205). Plaintiff stated she could drive or ride in a car, shopped in stores and by phone, and had no trouble managing money. (Tr. 205–06). Plaintiff's reported hobbies included reading, watching television, and watching and following sports. (Tr. 206). She explained she did these things every day but could no longer participate in sports due to fatigue and pain. (Tr. 206). She said she socialized with friends several times a week by going to dinner, playing cards, or visiting, and also reported she attended church, sporting events, and Alcoholics Anonymous meetings. (Tr. 206). Plaintiff said she helped at church by reading at mass and teaching CCD, but said she had cut back on social activities. (Tr. 206). Plaintiff believed she could walk up to two blocks before needing to rest for five minutes. (Tr. 207).

Plaintiff's mother submitted a third party function report stating she saw her daughter every day for approximately four hours to talk, watch television, and eat together. (Tr. 194). She said Plaintiff's activities included eating meals, taking care of personal hygiene, making phone calls, resting, and going to doctor appointments throughout the week. (Tr. 194). She reported Plaintiff took care of dogs, stating she helped her daughter care for the dogs when Plaintiff went to doctor

15

appointments. (Tr. 195). Plaintiff's mother stated Plaintiff formerly had better endurance and could work a full workday, participate in athletic activities, and do heavy cleaning. (Tr. 195). Her reports of Plaintiff's symptoms, functional abilities, and challenges largely echoed Plaintiff's own reports. (*See* Tr. 195–99).

ALJ Hearing

At the hearing, the ALJ asked about Dr. Wake's functional capacity evaluation and Plaintiff's attorney explained she had attempted to get the report without success. (Tr. 30–31). The ALJ told Plaintiff's attorney she could submit the report for consideration at any point prior to the ALJ issuing a final decision in the matter. (Tr. 31).

Plaintiff testified she drove  ten to twelve miles daily and had driven two hours to the hearing with only one short rest break. (Tr. 35–36). She explained she attended Alcoholics Anonymous meetings multiple times per week and had sponsored people there in the past. (Tr. 56). Plaintiff also testified she worked up to ten hours per week as a religious education coordinator at her church and also filled in babysitting when the latchkey person went out of town. (Tr. 38–39). She said her duties as the coordinator for religious education included setting up Sunday school programing and recruiting teachers. (Tr. 39). Describing her work at the church, Plaintiff said she used to move boxes and clean but no longer did these things. (Tr. 56–57). She explained her job responsibilities had changed and no longer included those duties, and also stated she could no longer physically handle that kind of work. (Tr. 56–57). Plaintiff reported she worked an hour or so a day answering phones as the secretary for her husband's business. (Tr. 39–40). She also testified she was once a substitute teacher but had not subbed the previous year. (Tr. 40). Plaintiff testified about her past work as a social worker, indicating she left that position after she remarried and moved because "[i]t

16

was just too much driving back and forth" and her husband realized it was taking a physical and emotional toll on Plaintiff. (Tr. 41).

Plaintiff explained she had received consistent treatment for her neck and back conditions. (Tr. 45–46). She described her symptoms and said treatment had helped but never solved her problems. (Tr. 46). She further explained stomach problems prevented her from taking a number of medications and said narcotic pain medication had not really helped. (Tr. 46). Plaintiff testified doctors had told her she was not a candidate for cervical spine surgery at that point. (Tr. 46–47). She stated she needed to change positions when sitting at a desk, her knees sometimes buckled when she walked, and she could only walk about five minutes without needing to change positions, stretch, or rest. (Tr. 48, 51). Plaintiff said her knees had been troubling her more recently, but she had recently helped her mother move and thought her increased knee trouble may have been due to over-exertion. (Tr. 48–49). Plaintiff said carpal tunnel syndrome caused her to drop and spill things, explaining both hands bothered her equally. (Tr. 50–51). She thought she could lift less than five pounds, but said she could lift a gallon of milk. (Tr. 51).

The VE testified Plaintiff's past relevant work was as a Medical Social Worker – typically a sedentary and skilled job that Plaintiff performed as light and skilled. (Tr. 60). The ALJ posed numerous hypotheticals to the VE. First, he asked the VE to consider a person limited to light work with frequent balancing, stooping, and crouching; occasional kneeling, crawling, and climbing of stairs, ramps, ladders, ropes, and scaffolds; occasional overhead lifting and reaching; who should avoid concentrated exposure to irritants; and who could perform only minimal feeling with her upper

17

extremities.[1] (Tr. 60). The VE testified this person could perform Plaintiff's past work as actually or customarily performed. (Tr. 60). The VE further testified someone could perform Plaintiff's past work as actually or customarily performed if all postural movements were limited to only occasional performance and crawling and kneeling were prohibited. (Tr. 60–61). Including "occasionally" limitations on postural activities and prohibitions on crawling and kneeling, the VE's answer did not change when the ALJ added a sit-stand option allowing the person to sit or stand at twenty minute intervals without breaking task.[2] (Tr. 62). And considering the sit-stand option, the occasional postural limitations, and no crawling or kneeling, the VE testified a person could perform Plaintiff's past work as described in the DOT if she were limited to sedentary rather than light work. (Tr. 63).

The VE testified the second hypothetical person could not perform Plaintiff's past work, but could perform other jobs existing in significant numbers, if she were limited to a low stress environment with only occasional decision making and occasional changes in the workplace. (Tr. 61–62). If the person were limited to sedentary work and the mental limitations, the VE testified she could still perform jobs existing in significant numbers. (Tr. 63–64). The VE testified an employer would tolerate up to two incidents of lateness or absence per month and an individual being off task up to ten percent of the work day. (Tr. 64–65).

Before adjourning the hearing, the ALJ reminded Plaintiff's counsel she could "feel free to submit" Dr. Wake's functional capacity exam report before he issued a final decision. (Tr. 69).

ALJ Decision

---

1. This most closely correlates with Dr. Stock's RFC assessment, though Dr. Stock did not include limitations on feeling. (*See* Tr. 607–10).

2. As described below, this represents the RFC the ALJ actually determined for Plaintiff. (*See* Tr. 13).

18

The ALJ found Plaintiff meets the insured status requirements through June 30, 2014. (Tr. 11). He found she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 11). Though the ALJ found Plaintiff suffered from a number of severe impairments – including degenerative joint disease bilateral knees, cervical degenerative disc disease with spondylosis, cervical disc herniation, upper extremity radiculopathy (right greater than left), history of carpal tunnel syndrome (status-post bilateral surgical release), diverticulitis, and osteopenia – he found these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11, 13).

After considering the record, the ALJ determined Plaintiff had the RFC to perform light work, except:

> she should only occasionally balance, stoop, crouch, or climb ramps and stairs. She should never kneel, crawl or climb ladders, ropes or scaffolds. She should have an opportunity to sit or stand at will every 20 minutes throughout the workday without breaking task. She should only occasionally perform overhead lifting or reaching. She should not work where more than minimal upper extremities feeling are required. She should avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas.

(Tr. 13). In making this determination, the ALJ noted most of Plaintiff's problems were with her neck and back and summarized her treatment history and symptoms. (Tr. 14). The ALJ found Plaintiff's testimony only partially credible because he found her statements regarding the intensity of her symptoms inconsistent with objective evidence. (Tr. 14–15). Specifically, the ALJ noted Plaintiff was not taking narcotic pain medication, suggesting her pain was not as debilitating as she alleged. (Tr. 15). Additionally, he emphasized that Plaintiff was working a part time skilled job and testified she was not working more hours because her job did not require more hours to complete. (Tr. 15).

19

The ALJ gave great weight to the state agency consulting physicians, finding their opinions "balanced, objective, and consistent with the evidence of record as a whole." (Tr. 15). The ALJ noted that though the experts did not treat Plaintiff, their "reports clearly reflect[ed] a thorough review of the record and [we]re supportable." (Tr. 15). The ALJ also noted the record contained no treating physician opinion, explaining Dr. Wake had not provided a report from his functional capacity evaluation. (Tr. 15). The ALJ did note Dr. Wake's report that Plaintiff had filled out a form he had not authorized. (Tr. 16). Ultimately, the ALJ relied on VE testimony to find Plaintiff would still be able to perform her past work as a medical social worker with the RFC he assigned her and found her not disabled. (Tr. 16). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc.*

20

*Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) &

21

416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges two assignments of error. First, she argues the ALJ improperly assessed her credibility and complaints of pain. Second, she argues the hearing decision was based on an incomplete record. (Doc. 13, at 1).

Credibility Analysis

Plaintiff argues substantial evidence – in the form of objective testing, clinical findings, and her physicians' prescribed treatments – supported Plaintiff's complaints of pain. (Doc. 13, at 8). She further states the ALJ did not mention a number of test results or findings in analyzing her pain, arguing the ALJ erroneously discredited her and based his conclusions only on the state agency medical consultant opinions. (Doc. 13, at 9). Additionally, Plaintiff argues the ALJ improperly evaluated her credibility when he found her testimony and written reports of symptom severity inconsistent with other record evidence. (Doc. 13, at 11–13).

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an

22

individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Here, the ALJ explained he found Plaintiff only partially credible because her testimony regarding her symptoms was not consistent with objective evidence. (Tr. 14–15). Specifically, he stated she was not taking any narcotic pain medication and was working a skilled job part time. (Tr. 15). He further explained the state agency reports and opinions of Plaintiff's functional capacity reflected a thorough review of the medical record and were consistent with the record. (Tr. 15).

23

Despite Plaintiff's arguments, substantial evidence supports the ALJ's decision to find her only partially credible.

Though Plaintiff points to a number of objective tests and findings appearing to corroborate the symptom severity Plaintiff alleged (Doc. 13, at 8–9), substantial objective evidence also showed numerous findings contradicting that alleged severity. Several times, Plaintiff was doing well or "ok" and she often indicated she felt her condition was improving with treatment. (Tr. 320–21, 323–25, 327–29, 331–34, 348–50, 359, 389, 397, 412, 434–436, 478–79, 503, 510, 514, 517, 519–20, 558–59, 562, 636). Physical examinations often revealed normal neurological examinations, full or almost-full motor strength, normal reflexes, normal sensation, and a normal or almost-normal gait. (Tr. 320–21, 324–25, 327, 329, 332, 334, 409, 454, 456, 478, 503, 510, 512, 520–21). It is true Plaintiff did not take certain pain medications because of stomach problems. (Tr. 508, 515). But when Dr. Wake asked if her symptoms were so severe that she would consider surgery, she said she wanted to avoid surgical intervention (Tr. 636), suggesting her back pain was not as severe as she alleged.

Moreover, Plaintiff's reports to the agency and even some doctors' treatment records showed she performed multiple part-time positions during the time she alleged she was disabled (Tr. 38–40, 173, 232, 320, 324, 636) and regulations explain that even if the work a plaintiff did was not substantial gainful activity, it may show she was able to do more work. 20 C.F.R. § 404.1571. Plaintiff inconsistently reported her reasons for leaving her job as a social worker in 2007, at times suggesting it was partly due to pain and stress and at times stating she electively left because she moved and did not want such a long commute. (Tr. 41–42, 164, 587, 636). Additionally, though Plaintiff takes issue with the ALJ citing it, she testified she did not work at the church more than ten

24

hours per week at least partly because her job did not require more hours. (Tr. 56–57). Further, her position at the church initially involved heavier work such as moving boxes and cleaning, and Plaintiff performed those duties during the time she claimed to be disabled. (Tr. 56–57).

Plaintiff's reported level of activity also suggested she was not completely disabled. Plaintiff could care for pets, mow the lawn and garden, perform light cooking and household chores, drive ten to twelve miles daily, shop, engage in numerous social activities, volunteer at her church, and attend Alcoholics Anonymous meetings multiple times per week. (Tr. 35, 38–40, 56–57, 203–06, 578, 590). Plaintiff testified she drove two hours to the hearing with only one brief stop. (Tr. 35–36). Plaintiff also testified she helped her mother move and the record showed she went bowling at least once during the time she claimed to be disabled. (Tr. 49, 394). Moreover, Plaintiff's health records reflected reports that she went on numerous vacations including trips to the beach and Las Vegas. (Tr. 492, 617, 655, 658).

The state agency physician reviewed Plaintiff's medical record and concluded she could perform a modified range of light work. (Tr. 606–13). The ALJ then limited Plaintiff to an even more restricted range of light work, and the RFC he assigned accounted for Plaintiff's subjective complaints of pain by allowing her a sit-stand option and incorporating a number of postural limitations. (*See* Tr. 13). The ALJ correctly stated Plaintiff's subjective complaints were not consistent with the objective evidence and thus he did not err in his credibility determination.

Complete Record

Plaintiff argues the ALJ based his decision on an incomplete record because he gave great weight to the consulting physician opinion and based his RFC determination "on outdated medical source statements from physicians who had[] made no contact with Plaintiff." (Doc. 13, at 13). She

continues, "Had more information been needed to make a proper determination, the ALJ could have either scheduled a consultative examination . . . or called a medical expert to testify." (Doc. 13, at 13). Further, Plaintiff argues the ALJ should have contacted Dr. Wake if explanation or authorization was needed to entitle his opinion to its full weight. (Doc. 13, at 13–14).

An ALJ is tasked with the final responsibility for determining a plaintiff's RFC based on the evidence as a whole. 20 C.F.R. §§ 404.1527(d)(2), 404.1564(c); 42 U.S.C. § 423(d)(5)(B). The ALJ must evaluate a number of factors in determining a plaintiff's RFC, including the medical evidence and the plaintiff's testimony, and this evaluation is not limited to medical opinion evidence. *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222, *2 (N.D. Ohio 2010). Social Security Ruling 96-8p further provides that the ALJ must base his RFC determination on all relevant evidence in the case record, including factors such as medical history, medical signs and laboratory findings, the effects of treatment, daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, and evidence from attempts to work, among others. SSR 96-8p, 1996 WL 374184, *5. An ALJ is not required to rely upon medical opinions, but to evaluate medical opinions based on their consistency with and support from medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1527(c)(2).

To support her argument, Plaintiff relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008), which stated,

> As a general rule, when a transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.

*Id. Deskin* raised the question of "when an ALJ should decide a case in the absence of a medical

26

opinion of a treating physician, consulting examiner, or medical expert as to the claimant's functional capacity." 605 F. Supp. 2d at 910–11. In *Deskin*, the plaintiff had multiple spine impairments and an extensive and well-documented treating relationship, but none of her treating physicians provided a medical opinion about her functional capacity. *Id.* at 910. The only medical opinion was the one prepared by the state agency reviewing physician, and the transcript included two years of medical records that doctor had not considered. *Id.* Though the court acknowledged the ALJ's discretion on whether to order a consultative examination or call a medical expert, it found

> [w]here the ALJ proceeds to make the residual functional capacity decision in the absence of a medical opinion as to functional capacity from *any medical source*, or, as here, with one made *without the benefit of a review of a substantial amount of the claimant's medical records*, there exists cause for concern that . . . substantial evidence may not exist.

*Id.* at 911 (emphasis added). The court then clarified that a medical source opinion may not be necessary in every case, such as a case "where the medical evidence shows relatively little physical impairment". *Id.* at 912.

The Sixth Circuit criticized *Deskin* in *Henderson*, stating it was "not representative of the law established by the legislature, and interpreted by the Sixth Circuit" and explaining "[t]he statute and regulations . . . require the ALJ to determine . . . a claimant's RFC based on the evidence as a whole . . . [by] evaluating several factors". 2010 WL 750222 at *2. The Sixth Circuit explained these factors include medical evidence – not limited to medical *opinion* evidence – and the claimant's testimony. *Id.* The Magistrate Judge who wrote *Deskin* had an opportunity to clarify his ruling in *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 (N.D. Ohio 2011). According to *Kizys*, "[p]roperly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test." 2011 WL 5024866 at *2. Rather, *Deskin* potentially applies in only two circumstances: (1) where an ALJ made

27

an RFC determination based on *no* medical source opinion; or (2) where an ALJ made an RFC determination based on an outdated source opinion that did not include consideration of a critical body of objective medical evidence. *Id.*

The first circumstance is not at issue here: Dr. Stock submitted a medical opinion assessing Plaintiff's RFC on December 12, 2009, based on a review of her medical records. (Tr. 606–13). Though Plaintiff's medical record included some records post-dating Dr. Stock's assessment that he therefore could not have considered, the Court finds these did not so change the medical evidence regarding Plaintiff's condition as to render Dr. Stock's opinion outdated. Specifically, records from 2010 showed Plaintiff continued to undergo radiofrequency treatment and knee injections and continued to report improvement. (Tr. 622, 628, 630, 636, 644, 681). These records also included Dr. Wake's treatment notes stating Plaintiff did not think her symptoms were bad enough to consider surgery, Plaintiff's fairly normal physical examination, and her statement to Dr. Wake that she electively quit work in 2007. (Tr. 636). Additionally, these records also included the results of Plaintiff's bone density test showing osteopenia, but the ALJ clearly took this into account in his RFC because he specifically found osteopenia to be one of Plaintiff's severe impairments. (Tr. 11, 676). And though the ALJ gave Dr. Stock's opinion great weight, he did not wholly adopt it. Instead, he incorporated additional restrictions, which further indicates he considered additional evidence outside the consultative opinion.

Here, the ALJ correctly considered the record evidence in Plaintiff's case including her testimony, her lengthy treatment record including substantial objective evidence showing she was not as impaired as she alleged, and a state agency consultant's expert opinion regarding Plaintiff's level of functioning. In contrast to *Deskin* and *Davies v. Comm'r of Soc. Sec.* – where the

28

consultative opinion the ALJ considered had not taken into account two years of additional medical evidence or where the evidence not considered included objective evidence showing the plaintiff's condition had worsened – here, the evidence related to Plaintiff's condition after the consultative review covered roughly eleven months and showed she was reporting improvement or relief through treatment and did not want surgery. *See Deskin*, 605 F. Supp. 2d at 910–11; *Davies*, 2012 WL 1068736 at *4. Specifically with regard to Dr. Wake, the record contains no records after February 25, 2010. (*See* Tr. 636). At that time, Dr. Wake had not seen Plaintiff for almost a year, Plaintiff did not want surgery, she had a largely normal physical examination, and she said she electively quit work in 2007. (Tr. 636). Overall, the evidence Dr. Stock opinion did not consider was not enough to constitute a "critical body of objective medical evidence" such that the ALJ erred by failing to further expand the record. *See Kizys*, 2011 WL 5024866 at *2

### CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

                                      s/James R. Knepp, II
                                 United States Magistrate Judge